```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
24/7 RECORDS, INC.,

                Plaintiff,                    OPINION

        - against -                           03 Civ. 3204 (MGC)

SONY MUSIC ENTERTAINMENT, INC., and
SHERIDAN SQUARE ENTERTAINMENT, LLC
d/b/a ARTEMIS RECORDS,

                Defendants.
------------------------------------X
```

APPEARANCES:

    CINQUE & CINQUE, P.C.
    Attorneys for Plaintiff
    845 Third Avenue, Suite 1400
    New York, NY 10022

    By:  Robert W. Cinque, Esq.


    MANATT, PHELPS & PHILLIPS, LLP
    Attorneys for Defendants
    7 Times Square
    New York, NY 10036

    By:  Gregory A. Clarick, Esq.
        Kimo Peluso, Esq.
        Jonathan Melber, Esq.

**Cedarbaum, J.**

This diversity action arises out of a record distribution contract entered into by plaintiff 24/7 Records, Inc. ("24/7") and defendant Sheridan Square Entertainment, LLC d/b/a Artemis Records ("Artemis").  The complaint alleges that Artemis breached the contract, and that defendant Sony Music Entertainment, Inc. ("Sony") unlawfully induced Artemis to do so.  As proof of its damages, 24/7 proffers two witnesses as experts.  Defendants move *in limine* to exclude the testimony of these witnesses.  For the following reasons, the motion is granted.

BACKGROUND

In June of 2001, 24/7, an independent Florida-based record label, entered into a contract with Artemis pursuant to which Artemis agreed to distribute 24/7's records in the United States for a three year period.  The contract provided that RED Distribution, Inc. ("RED"), a Sony subsidiary, would perform certain distribution tasks on Artemis' behalf.  The complaint alleges that Artemis terminated the contract in November of 2002, approximately one-and-a-half years before the expiration of the three year period, and that it did so under pressure from Sony, which saw 24/7 as an upstart competitor.  The complaint also

alleges that Artemis' breach of contract caused the demise of 24/7.  As damages, 24/7 seeks the fair market value of its entire business on the date of the breach.  Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts," Schonfeld v. Hilliard, 218 F.3d 164, 178 (2d Cir. 2000).

To establish fair market value on the date of the alleged breach, 24/7 proffers two witnesses as experts, Gordon H. Anderson and David M. Berman.  Anderson, currently the CEO and owner of a management consulting firm specializing in the creation and development of startup music companies, has approximately 40 years of experience in the music industry.[1]  He opines that the fair market value of 24/7 at the time of the alleged breach was "$2 million at the very lowest end of the spectrum and $5 million at the higher end" (Clarick Decl., Ex. A, ¶ 16).

Berman, an attorney who currently works as a consultant and expert witness in music industry lawsuits, has approximately 30

---

[1] According to his *curriculum vitae*, Anderson has worked as the CEO and Owner of Music Corps Inc., the Vice President and General Manager of Savage Records, the Executive Vice President and Co-founder of Grudge Music Group, the Vice President of Marketing and Promotion of Manhattan/Blue Note Records, the Vice President of Marketing and Promotion of CBS Records, and the National Director of Sales for Columbia Records.  In these roles, he asserts, he has developed marketing plans, sales strategies, and artist promotions, negotiated artist and distribution contracts, and launched a number of record labels.  However, Anderson is not licensed by any organization as a qualified appraiser, has no formal training in valuation, accounting, or finance, and has never read any scholarly treatises or materials on valuation.

3

years of experience in the music industry.[2] He "concur[s]" with Anderson's opinion that the fair market value of 24/7 at the time of the alleged breach was between $2 million and $5 million. (Clarick Decl., Ex. C, at 1.)

Defendants move to exclude the testimony of Anderson and Berman on the ground that their testimony does not meet the standards for admissibility under Fed. R. Evid. 702.

DISCUSSION

Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[2] According to his *curriculum vitae*, Berman has worked as the Senior Vice President of Business Affairs for Warner Brothers Records, the President of the North American subsidiary of EMI Records, the President of Capitol Records, General Counsel to Geffen Records, and the President of Buena Vista Music Group. In these roles, he asserts, he has "been directly involved in the valuation, negotiation, purchase and sale of income-producing assets (such as 24/7 Records and its distribution agreement with Artemis) on numerous occasions" (Clarick Decl., Ex. C, ¶ 1). However, Berman is not licensed by any organization as a qualified appraiser, cannot recall having taken a course in business valuation, and has never read any reference book or scholarly work on business valuation. Although Berman's *curriculum vitae* indicates that he has testified as an expert in several music industry cases, in none was he asked to value a record label.

The rule requires the district court to ensure that expert testimony is reliable. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167, 1174 (1999). "When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, . . . Rule 702 mandate[s] the exclusion of that unreliable opinion testimony." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002). The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. See Fed. R. Evid. 702 advisory committee's note (2000); In re Zyprexa Products Liab. Litig., 489 F.Supp.2d 230, 282 (E.D.N.Y. 2007).

In assessing the reliability of expert testimony, a district court may consider (1) whether the expert's technique can be tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has gained "general acceptance" in the relevant community. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593-595, 113 S.Ct. 2786, 2796-2798 (1993).

These factors do not, however, constitute a "definitive checklist or test" of reliability. Id. at 593, 113 S.Ct. at 2796. Rather, the inquiry envisioned by Rule 702 is "a flexible

one," id. at 594, 113 S.Ct. at 2797, and "[t]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination," Kumho, 526 U.S. at 142, 119 S.Ct. at 1171 (emphasis in original).

I:   Admissibility of Gordon Anderson's Proposed Testimony

Gordon Anderson opines that "the valuation of 24/7 as a going enterprise . . . as of November 7, 2002 is $2 million at the very lowest end of the spectrum and $5 million at the higher end" (Clarick Decl., Ex. A, ¶ 16).[3]

Anderson describes the "$2 million figure [as] extremely conservative and directly referable to the amount of money actually invested in 24/7 as of that date" (id.).  As for the $5 million figure, Anderson explains that his opinion is based on his assessment of the "the intrinsic value" of the following "factors" (id.).[4]  Anderson asserts that, at the time of the breach, 24/7 "had proven to be financially solvent" (id. ¶ 1) and "successful in exploiting its artists and music" (id. ¶¶ 2, 8). According to Anderson, 24/7 had already "established a fair

---

[3] It should be noted that, in a supplemental declaration submitted after oral argument of defendants' motion, Anderson appears to embrace a valuation range of $5.9 million to $11.8 million, although none of the information upon which his initial opinion was based has changed.

[4] For purposes of assessing the reliability of Anderson's testimony, I will assume these "factors" to be true.

6

degree of industry notoriety" at the time of the breach. (Id. ¶ 3.)  According to Anderson, 24/7's greatest success was in securing a national distribution agreement with Artemis; and the agreement was especially valuable because it provided that RED, a Sony subsidiary with access to the shelves of national retailers like Best Buy, would perform certain distribution tasks on Artemis' behalf.  According to Anderson, the agreement became even more valuable when Artemis "[made] its staff available to 24/7," (id. ¶ 4) and the two entities came to enjoy an "open atmosphere and interchange with respect to . . . marketing strategies" (id. ¶ 5).  According to Anderson, 24/7 also benefited from the expertise of its co-founder, a respected veteran of the music business named Lennie Petze.

Anderson explains his low-end figure of $2 million as "directly referable to the amount of money actually invested in 24/7" at the time of the alleged breach.  (Id. ¶ 16.)  Anderson does not provide any source for this theory of valuation.  Nor does he testify that this is an established or accepted method of valuing a business.  Moreover, he does not explain how or why this theory of valuation applies to this case.

Anderson does not explain his calculation of the high-end figure of $5 million.  He arrived at it without projecting 24/7's future cash flow.  Cf. Lippe v. Bairnco Corp., 288 B.R. 678, 689 (S.D.N.Y. 2003) ("Many authorities recognize that the most

7

reliable method for determining the value of a business is the discounted cash flow . . . method."). And he does not identify comparable companies that have been sold for known prices.

According to Anderson, the $5 million figure is based upon "the *intrinsic value* of all of the factors" enumerated above. (Clarick Decl., Ex. A, ¶ 16)(emphasis supplied). "Intrinsic value" is an inherently subjective and speculative concept. It cannot be tested, it has no known rate of error, and it is not subject to any particular standards or controls. See Daubert 509 U.S. at 593-595, 113 S.Ct. 2796-2798. The shortcomings of this approach are exacerbated by the fact that Anderson does not explain how he translated 24/7's financial solvency, successful exploitation of artists and music, industry notoriety, and relationship with Artemis and RED into dollar figures. At his deposition he testified that he did not ascribe independent values to any of these factors.[5] Thus, his method of valuation cannot be evaluated.

In response to these criticisms, Anderson asserts that "[b]ased upon my years of experience in the record industry, I can unequivocally state that the methodology that I used is typical and entirely consistent with that employed on countless

---

[5] It should be noted that, in a supplemental declaration submitted after oral argument of this motion, Anderson asserts that he allocated $2 million to $4 million "for market share," $1 million to $2 million for 24/7's executives, $1 million to $2 million "for filling the gap," and $1.9 million to $3.8 million "for the artist roster." (Anderson Supp. Decl., ¶ 17-18.) Yet these figures are inconsistent with his initial valuation range of $2 million to $5 million.

8

occasions by record executives when considering an acquisition or making an evaluation of 24/7 and its distribution arrangement and business as an income-producing asset" (Clarick Decl., Ex. B, ¶ 11). However, 24/7 has not cited a single published authority in support of the proposition that standard business valuation methods do not apply in the record industry context. Nor has 24/7 cited a single case in support of the proposition that an expert opinion based upon an unverifiable, inchoate, "intrinsic value" analysis is admissible under Fed. R. Evid. 702. As the Supreme Court noted in General Electric Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519 (1997), "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

    24/7's reliance on Schonfeld v. Hilliard, 218 F.3d 164 (2d Cir. 2000) is unavailing. In Schonfeld, the Second Circuit held that where a defendant's breach of contract deprives the plaintiff of an income producing asset that was in its possession prior to the breach, the plaintiff may be entitled to consequential damages measured by the fair market value of the asset at the time of the breach. Id. at 176. Although Schonfeld indicates that the asset's value is a proper subject of expert testimony where no prior sales history is available, id. at 178, it does not address the standard for admitting such testimony

9

into evidence.  Nor does it suggest that the standards set out in Fed. R. Evid. 702 do not apply.

24/7's reliance on <u>Contemporary Mission, Inc. v. Famous Music Corp.</u>, 557 F.2d 918 (2d Cir. 1977), <u>Boyce v. Soundview Technology Group, Inc.</u>, 464 F.3d 376 (2d Cir. 2006), and <u>Trachtebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.</u>, 487 F.3d 89 (2d Cir. 2007) is similarly misplaced.  Those cases articulate and reaffirm the "long standing New York rule" that when "the existence of damage is certain, and the only uncertainty is as to its amount, . . . the burden of uncertainty as to the amount of damage is upon the wrongdoer." <u>Contemporary Mission</u>, 557 F.2d at 926.  Those cases do not, however, address the admissibility of expert testimony, and they do not displace the reliability requirements of Fed. R. Evid. 702.

II:  Admissibility of David Berman's Proposed Testimony

David Berman "concur[s]" with Anderson's opinion that the fair market value of 24/7 at the time of the alleged breach was between $2 million and $5 million.  (Clarick Decl., Ex. C, at 1.) In arriving at his opinion, Berman appears to have considered "the personnel involved in running the label" (Clarick Decl., Ex. C, ¶ 6), "the significant amount of chart success [24/7 enjoyed] in its brief history" (id. ¶ 7), 24/7's possible appeal to a

potential buyer "who wanted to fill a niche (i.e., Dance) without going through the trouble of starting a Dance Music department from scratch" (id.), and the "benefit of an Artemis agreement which gave [24/7] the promotion efforts of a fully staffed promotion department as well as distribution through RED" (id. ¶ 8).

Berman emphasizes the significance of 24/7's personnel, artist roster, early airplay, chart success, and relationship with Artemis and RED, but like Anderson, he does not explain how he valued these factors nor how he assessed their relative significance.  Nor does he project 24/7's future cash flow or compare 24/7 to similar record labels sold for known prices.  Instead of applying a discernable methodology to the data before him, Berman appears to rely on his instinct, an approach that cannot be tested, has no known rate of error, and is not subject to any standards.  See Daubert 509 U.S. at 593-595, 113 S.Ct. 2796-2798.

CONCLUSION

For the foregoing reasons, the testimony of Gordon Anderson and David Berman does not meet the standards of Fed. R. Evid. 702.  Accordingly, their testimony, which plaintiff proffers as expert testimony, is not admissible in evidence.

```
     SO ORDERED.


Dated:    New York, New York
          September 24, 2007



                         S/_____
                              MIRIAM GOLDMAN CEDARBAUM
                              United States District Judge
```