UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
24/7 RECORDS, INC.,

                    Plaintiff,              AMENDED OPINION

        -against-                           03 Civ. 3204 (MGC)

SONY MUSIC ENTERTAINMENT, INC. and
SHERIDAN SQUARE ENTERTAINMENT, LLC
d/b/a ARTEMIS RECORDS,

                    Defendants.

----------------------------------X


APPEARANCES:

            CINQUE & CINQUE, P.C.
            Attorneys for Plaintiff
            845 Third Avenue
            New York, New York 10022

            By:  Robert W. Cinque, Esq.


            MANATT, PHELPS & PHILLIPS, LLP
            Attorneys for Defendants
            7 Times Square
            New York, New York 10036

            By:  Gregory A. Clarick, Esq.
                 Robert A. Jacobs, Esq.

**Cedarbaum, J.**

24/7 Records, Inc. ("24/7"), a start-up record production
company, sues Sheridan Square Entertainment, LLC, d/b/a Artemis
Records ("Artemis") (now known as Sheridan Square Entertainment,
Inc.), a record distributor, for breach of contract arising from
Artemis's termination of a record distribution agreement and
other miscellaneous breaches of that agreement.  24/7 also sues
Sony Music Entertainment, Inc. ("Sony") (now known as Sony BMG
Music Entertainment, Inc.) for tortious interference with
contract and unfair competition arising from Sony's alleged role
in procuring Artemis's breach of the distribution agreement.
Defendants move for summary judgment on all claims on the
following grounds: 1) 24/7's administrative dissolution negates
its standing to bring these claims and provides cause for
Artemis's termination of the agreement, 2) 24/7 failed to provide
Artemis with notice and an opportunity to cure the alleged
termination, 3) 24/7 cannot prove compensatory or punitive
damages for its claims, 4) 24/7 cannot maintain its claims
against Sony for tortious interference with contract and unfair
competition, and 5) various arguments regarding the miscellaneous
breach of contract claims.  For the following reasons, the motion
is granted in part and denied in part.

Unless otherwise noted, the following facts are undisputed.

24/7 was incorporated under the laws of Florida in April of 2001 by Louis Pace. 24/7 and Artemis entered into a record distribution agreement on June 18, 2001, under which Artemis became the exclusive distributor of 24/7's records in the United States for an initial period of three years. The agreement contemplated that a Sony subsidiary, RED Distribution, Inc. ("RED"), would perform certain distribution tasks for Artemis. The agreement provides that New York law governs its validity, interpretation, and legal effect.

On June 20, 2001, Pace formed 24/7 Records, LLC ("24/7 LLC" or "the LLC"). According to Pace's deposition testimony, the LLC was formed because, as compared to the corporate form, the LLC form "provided a better methodology for foreign investors to be involved." The foreign investor involved here was Egon Putzi, an Austrian national who invested substantial sums of money in 24/7 LLC. Robert W. Cinque, Esq., counsel for 24/7, confirmed at oral argument on March 19, 2008 that "the reason for the LLC was that[,] after they formed [24/7], they realized that Putzi is a non-U.S. citizen and that would destroy the subchapter S tax benefits." Pace further testified that once the LLC was formed, "the Inc. company was put aside and we did business as the LLC."

24/7 LLC conducted all of the business for the record label and filed tax returns. No tax returns were filed for 24/7, which was administratively dissolved on October 4, 2002 for failure to file an annual report. 24/7 was reinstated on March 6, 2008.

This dispute was sparked by 24/7's production of a CD single of a cover version of "The Ketchup Song (Heh Hah)." In the summer of 2002, a group named "Las Ketchup" recorded "Aserejé," later renamed "The Ketchup Song (Heh Hah)," which was popular outside of the United States. Columbia Records, a Sony affiliate, distributed the original song as a single and as part of a full-length album. 24/7's version of the Ketchup Song was performed by a group named "The Hines Girls," and the cover of the CD jacket featured a ketchup bottle with the words "Hines Girls" and "The Ketchup Song" on the bottle's label.

Shortly after 24/7 released its version of the Ketchup Song, Artemis pulled the record from distribution after receiving complaints from Sony officials. In a letter to 24/7 dated November 7, 2002 ("November 7 letter"), Artemis informed 24/7 that continued distribution of the Ketchup Song "might infringe rights owned by the distributor of the original version of this song and might also lead to a trademark dispute with the owner of the Heinz Ketchup trademark." The letter went on to state that, for other reasons, Artemis "agrees that it would be best to terminate this relationship immediately," and that Artemis will

"be sending to retail outlets notice advising them that Artemis
will not be distributing further product."  As of November of
2002, 24/7 had eleven recordings in distribution, with three
others in preparation for distribution, including the Ketchup
Song.

The parties disagree as to how or when the distribution
agreement was terminated.  24/7 argues that Artemis unilaterally
terminated the agreement through the November 7 letter.  Artemis
argues that 24/7 abandoned its business as of November 7, and
that 24/7's response letter dated November 14, 2002 failed to
provide Artemis with notice and an opportunity to cure the
alleged breach of the agreement.  However, it is undisputed that
as of November 7, 2002, 24/7 ceased doing business.

During its one and one-half years in business, 24/7 never
made a profit.  On its 2001 and 2002 tax returns, the LLC
reported losses of $337,519 and $811,558, respectively.  From
June of 2001 to November of 2002, the LLC received capital
contributions totaling approximately $1,230,000.  24/7 contends
that the total amount invested in the venture was $1,826,250,
which includes the capital contributions, money used for personal
expenditures by Pace and Putzi, a letter of credit issued to
Artemis by Putzi and Susan F. Jones, and other non-cash assets.
By the end of June of 2002, the LLC had only $19,384 in its
account at Salomon Smith Barney, which was held in the name of

"24/7 Records." Putzi testified at his deposition that, upon starting the business, he thought that he might have to invest up to $5,000,000 in the company. On July 19, 2002, Putzi made his last contribution to the LLC, $300,000. Following that investment, the LLC had $279,870 in its account at the end of July of 2002, $225,254 at the end of August, $75,090 at the end of September, $33,668 at the end of October, and roughly $12,500 on the eve of the alleged termination. By the end of November of 2002, the LLC had $1,432 in its account, and Artemis was holding an additional $95,106 of credit in reserve to cover future returns of 24/7's records.

The Ketchup Song claim was dismissed on summary judgment because 24/7 failed to obtain a copyright license from Sony before distributing the song, a condition for distribution contained in the agreement. 24/7 Records, Inc. v. Sony Music Entm't, Inc., 429 F.3d 39, 41-43 (2d Cir. 2005), aff'g in part No. 03-3204, 2004 U.S. Dist. LEXIS 18702, *10-16 (S.D.N.Y. 2004). While 24/7's breach of contract claim focused primarily on Artemis's decision not to distribute the Ketchup Song, it also included claims arising from the general termination of the agreement and other miscellaneous breaches of the agreement. 429 F.3d at 41, 43-46. The Second Circuit remanded those contract claims against Artemis, as well as 24/7's claims against Sony for tortious interference with contract and unfair competition, for

further proceedings.  <u>Id</u>. at 47-48.  Defendants now move for summary judgment on those remaining claims.

DISCUSSION

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In deciding whether a genuine issue of fact exists, the court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  <u>Dallas Aero., Inc. v. CIS Air Corp.</u>, 352 F.3d 775, 780 (2d Cir. 2003).  Summary judgment is appropriate when "the nonmoving party [fails] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

I. Administrative Dissolution

Defendants argue that 24/7 was administratively dissolved as a Florida corporation on October 4, 2002, and that under Florida corporation law, it cannot maintain this suit. Even if it could maintain this suit, defendants argue that 24/7's dissolution is a proper cause for termination under the distribution agreement, which provides in ¶ 9.01(a) that "[i]n the event of ... (2) your dissolution ... Distributor shall have the right and option to terminate the Term hereof upon notice to you." 24/7 argues that New York corporation law should apply, that this action is part of 24/7's winding up of its affairs, and that 24/7 has been reinstated as a Florida corporation.

A corporation's capacity to sue or be sued is determined by the law under which it was organized. Fed. R. Civ. P. 17(b)(2). 24/7 is a Florida corporation, to which Florida law applies. Since 24/7 was successfully reinstated, the standing argument is moot. "[A] corporation administratively dissolved for technical reasons may reinstate itself by filing a satisfactory current annual report." Allied Roofing Indus. v. Venegas, 862 So. 2d 6, 8 (Fla. 3d Dist. Ct. App. 2003). "When the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution and the corporation resumes carrying on its business as if the administrative dissolution had never occurred." Fla. Stat. § 607.1422(3) (2008).

The argument that 24/7's administrative dissolution was just
cause for termination of the distribution agreement is meritless.
Although 24/7 failed to respond directly to this argument in its
opposition papers, Artemis never provided notice that it was
terminating the agreement on that basis.  Paragraph 9.01(a)
requires that notice be given, and ¶ 14.03, the notice and cure
provision, provides that

> Neither party to this Agreement shall be
> deemed to be in breach of any of its
> obligations hereunder unless and until the
> other party shall have given such party
> specific written notice of such default and
> the alleged breaching party shall have failed
> to cure such default within thirty (30) days
> after receipt of such notice.

## II. Notice and Opportunity to Cure

The parties disagree about how the distribution agreement
was terminated.  24/7 argues that Artemis unilaterally terminated
the agreement by the November 7 letter.  Artemis contends that
the letter did not terminate the agreement and that 24/7 simply
ceased its business as of that date in response to the letter.
Whether the November 7 letter unilaterally terminated the
agreement is clearly disputed.  However, defendants argue that
24/7 failed to provide Artemis with notice and opportunity to
cure the alleged breach, and that this failure undermines 24/7's
breach of contract claim.  24/7 contends that invoking the notice
and cure provision would have been futile because Artemis
unilaterally terminated the agreement on November 7.

Defendants cite a number of cases that stand for the
proposition that the terms of a contract regarding termination
must be complied with before a breach of contract claim can be
asserted.  E.g., Bausch & Lomb Inc. v. Bressler, 977 F.2d 720,
727 (2d Cir. 1992) ("'Under New York law, ... where the Agreement
specifies conditions precedent to the right of cancellation, the
conditions must be complied with.'" (quoting Consumers Power Co.
v. Nuclear Fuel Servs., Inc., 509 F. Supp. 201, 211 (W.D.N.Y.
1981))).  Here, the question of who terminated the agreement is
in dispute.  Assuming that Artemis terminated the agreement with

the November 7 letter, under these decisions, Artemis failed to provide 24/7 with the required notice and cure opportunity, not vice versa.

Moreover, defendants' arguments run counter to the long-standing principle of New York law that "[o]nce it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts, such as conditions precedent." Allbrand Discount Liquors, Inc. v. Times Square Stores Corp., 60 A.D.2d 568, 568 (2d Dep't 1977) (citing Kooleraire Serv. & Installation Corp. v. Bd. of Educ., 28 N.Y.2d 101, 106 (1971)). See also J. Petrocelli Constr., Inc. v. Realm Elec. Contrs., Inc., 15 A.D.3d 444, 446 (2d Dep't 2005) (rejecting motion for judgment as a matter of law because of factual dispute over party's repudiation of the contract). Defendants' primary authority, Bausch & Lomb Inc. v. Bressler, notes that when a "repudiating party expressly disavowed any further duties under the contract at issue, in effect declaring the contract at an end[,] ... it would have been futile for the aggrieved part[y] ... to provide the breaching part[y] with opportunities to cure [its] repudiation[]." 977 F.2d at 728 (citing Allbrand, 60 A.D.2d at 568). Thus, the material fact at issue here, whether Artemis's November 7 letter constituted unilateral termination of the agreement, precludes summary judgment for defendants on the issue of notice and cure.

Artemis also asserts that it continued to perform its duties under the agreement, and that by doing so it effectively cured any possible breach that the November 7 letter may have caused. However, there is a factual dispute as to whether Artemis complied with its obligations under the agreement after November 7.


III. Compensatory Damages

24/7 has proffered a number of damages theories for its breach of contract claim, and changed those theories a number of times. Those damages theories include lost profits, destruction of its business, reliance damages, and loss of an income-producing asset. Defendants argue that the corporation 24/7, the only party to the distribution agreement, cannot show any damages because 24/7 LLC conducted all of the business and received all of the capital invested in the record label. They also contend that 24/7 cannot prove damages under any of its constantly changing theories.

A. Corporate Form

Defendants argue that 24/7 can show no compensatory damages because it neither spent nor made any money, and that any purported loss by the LLC is not recoverable by 24/7 because they are separate entities. 24/7 asserts that it was a manager or member of the LLC, and/or that it was a joint venturer with the LLC. It also argues that the distinction in corporate form was never used, and that at all times there was a single business conducted in the same location under the general name of "24/7 Records."

There is no factual basis for 24/7's new assertions that it was a member of the LLC or a joint venturer with the LLC. 24/7 has proffered no evidence to support this assertion. There are also no legal principles upon which such relationships would entitle 24/7 to recover damages for the LLC's purported losses.

24/7 also argues that there was, in essence, just one business and that the difference in corporate form was never used vis-à-vis Artemis, which never objected to dealing with the LLC throughout their business relationship. To support this proposition, 24/7 cites <u>Reif v. Williams Sportswear, Inc.</u>, 9 N.Y.2d 387, 393 (1961), but in that case the Court of Appeals held that the defendant could not change its corporate form to avoid the obligations of a collective bargaining agreement. Here, defendants argue that plaintiff cannot treat another entity's damages as its own. 24/7 also cites <u>Cohen v. OrthoNet N.Y. IPA, Inc.</u>, 19 A.D.3d 261, 261 (1st Dep't 2005), which held that the plaintiff could amend a certificate of doing business to include another name under which she did business. That case is also inapposite.

Defendants cite extensive New York authority for the rule that a corporation cannot pierce the corporate veil that it created for its own benefit and cannot treat damages suffered by another entity as its own. <u>Carey v. Nat'l Oil Corp.</u>, 592 F.2d 673, 676 (2d Cir. 1979) (cancellation of contracts between plaintiff's foreign affiliate and Libya's National Oil Corporation did not directly effect plaintiff for purposes of a sovereign immunity exception); <u>STS Mgmt. Dev., Inc. v. N.Y. State Dep't of Taxation & Fin.</u>, 40 A.D.3d 620, 622 (2d Dep't 2007) (plaintiff could not assert claim for closely affiliated corporation); <u>Wilhelmina Models, Inc. v. Fleisher</u>, 19 A.D.3d 267, 269 (1st Dep't 2005) (claim dismissed because alleged damages were to another entity, not plaintiff); <u>Bank of Am. Corp. v. Braga Lemgruber</u>, 385 F. Supp. 2d 200, 223 (S.D.N.Y. 2005) (denying plaintiffs' claims for conversion of certain bank funds from affiliated entities); <u>Motorola Credit Corp. v. Uzan</u>, 274 F. Supp. 2d 481, 495 (S.D.N.Y. 2003) (dismissing claims for which plaintiff's affiliate, not plaintiff itself, suffered injury); <u>Diesel Sys. v. Yip Shing Diesel Eng'g Co.</u>, 861 F. Supp. 179, 181

(E.D.N.Y. 1994) (plaintiff lacked standing to bring claim for injury suffered by sister corporation); <u>Bross Utils. Serv. Corp. v. Aboubshait</u>, 618 F. Supp. 1442, 1444-45 (S.D.N.Y. 1985) (plaintiffs, who negotiated deal with defendants but entered into that deal through a newly created foreign subsidiary, could not sue on that foreign subsidiary's behalf even if it was a shell corporation created for tax purposes and was later dissolved); <u>Boise Cascade Corp. v. Wheeler</u>, 419 F. Supp. 98, 101-02 (S.D.N.Y. 1976) (subsidiary was an indispensable party because plaintiff parent corporation could not pierce the corporate veil to sue on the subsidiary's behalf, even if plaintiff performed much of the work and the subsidiary was for some time a "dummy" corporation).

24/7 has standing to bring the breach of contract claim because it is party to the distribution agreement with Artemis. Given that the LLC conducted the entire business and claimed all profits and losses, 24/7's ability to claim any damages would seem to be foreclosed. However, it cannot be fairly stated that 24/7 used the corporate form in order to gain any advantage vis-à-vis the defendants. Throughout the relationship between the parties, no distinction was made between the entities, and for most of this litigation, defendants continued to ignore that distinction. <u>Cf.</u> <u>Musico v. Champion Credit Corp.</u>, 764 F.2d 102, 110 (2d Cir. 1985) (holding that a standing and lack of subject matter jurisdiction argument was waived "because of the defendants' own disregard of the separate status of the ... corporations ..., and because of their own acceptance during most of this litigation of the ... estate as the real party in interest ....").

Moreover, the LLC was not a subsidiary or affiliate of 24/7. It conducted, without any input or direction from 24/7, all of the business that 24/7 was supposed to conduct. A subsidiary is "[a] corporation in which a parent corporation has a controlling share," and an affiliate is "[a] corporation that is related to another corporation by shareholdings or other means of control." <u>Black's Law Dictionary</u> 368, 63 (8th ed. 2004). There was no control being exerted by any entity over the other because 24/7 did nothing at all and was dissolved as a Florida corporation in October of 2002 for inactivity. Thus, this case is not an instance in which a corporation created another entity to protect itself in a transaction. Rather, the LLC was created to replace 24/7, but no acts were taken to formalize this arrangement. In essence, a <u>de facto</u> merger took place, though there was no sale or transaction. <u>See</u> <u>Fitzgerald v. Fahnestock & Co.</u>, 286 A.D.2d 573, 574 (1st Dep't 2001) ("The hallmarks of a de facto merger include: continuity of ownership; cessation of ordinary business and dissolution of the acquired corporation as soon as possible; assumption by the successor of the liabilities ordinarily

necessary for the uninterrupted continuation of the business of
the acquired corporation; and, continuity of management,
personnel, physical location, assets and general business
operation.") (citation omitted); New York v. Nat'l Serv. Indus.,
460 F.3d 201, 209 (2d Cir. 2006) (same).

New York courts have ignored the corporate form based on
equitable considerations for the benefit of plaintiffs in cases
where corporations were wholly owned by the estates of decedents.
See, e.g., Musico, 764 F.2d at 108-09 (collecting cases); In re
Estate of Tuttle, 4 N.Y.2d 159, 164 (1958); In re Estate of
Weinstein, 25 A.D.2d 776, 776 (2d Dep't 1966).  A similar
situation is present here where 24/7 and the LLC are no longer in
business.  Both entities were formed by the same people at the
same address for the same purpose, but only the LLC was used, and
both have now essentially been abandoned.  Moreover, "the parties
themselves disregarded the corporate form" for the entire span of
their relationship and most of this litigation.  Musico, 764 F.2d
at 109.

Nonetheless, 24/7 still must provide a viable damages
theory, which it has so far been unable to do.

B. Lost Profits Damages
In response to this motion, 24/7 did not proffer a lost
profits theory of damages for its breach of contract claim.
Rather, it asserted a reliance damages theory.  But in the joint
pre-trial order, 24/7 reasserts a lost profits theory.  The
initial abandonment notwithstanding, there is no basis for 24/7's
claim of lost profits damages because such damages are entirely
speculative.

"A party may not recover damages for lost profits unless
they were within the contemplation of the parties at the time the
contract was entered into and are capable of measurement with
reasonable certainty."  Ashland Mgmt. v. Janien, 82 N.Y.2d 395,
403 (1993).  Damages do not have to be calculated with
"mathematical precision," but they must "be capable of
measurement based upon known reliable factors without undue
speculation."  Id.  "[D]amages may not be merely speculative,
possible or imaginary, but must be reasonably certain and
directly traceable to the breach, not remote or the result of
other intervening causes."  Kenford Co. v. County of Erie, 67
N.Y.2d 257, 261 (1986).  "If it is a new business seeking to
recover for loss of future profits, a stricter standard is
imposed for the obvious reason that there does not exist a
reasonable basis of experience upon which to estimate lost
profits with the requisite degree of reasonable certainty."  Id.
New York law also recognizes the "inherent uncertainties of
predicting profits in the entertainment field in general."  Id.

at 263.  See also Zink v. Mark Goodson Prods., Inc., 261 A.D.2d
105, 106 (1st Dep't 1999).

    "24/7 Records" was in business through the LLC for almost
seventeen months.  On its 2001 and 2002 tax returns, the LLC
reported losses of $337,519 and $811,558, respectively.  On the
eve of the alleged termination of the distribution agreement, the
LLC's account statements reflect an estimated balance of $12,500
cash on hand remaining in the business.  24/7, a new business in
the entertainment industry, has not presented any non-speculative
measure of lost profits based on reliable factors.  The expert
testimony on damages that 24/7 proffered was inadmissible for
unreliability.  24/7 Records, Inc. v. Sony Music Entm't, Inc.,
514 F. Supp. 2d 571, 575-77 (S.D.N.Y. 2007).  24/7 points to
evidence of past revenue, but fails to take into account its
operating costs.  S.A.B. Enters., Inc. v. Athens, 164 A.D.2d 558,
565 (3d Dep't 1991) ("The courts have generally rejected the use
of gross receipts or gross profits as a means of establishing the
value of a loss or injury to business interests.").  Indeed,
there is no evidence that 24/7 or the LLC ever made a profit, and
there is no reliable, non-speculative means of ascertaining
whether the business could have become profitable during the one
and one-half years remaining under the exclusive distribution
period of the agreement.  Whether 24/7 would have made any profit
after its unprofitable year and a half in business is not capable
of measurement with reasonable certainty.  Accordingly, a lost
profits theory of damages may not be presented at trial.

    C. Destruction of Business
    In response to this motion, 24/7 withdrew its theory of
damages for destruction of its business and proffered a reliance
theory of damages.  Yet the destruction of business theory has
reappeared in the joint pre-trial order.  Without regard to the
initial abandonment of the theory, 24/7 cannot advance a
destruction of its business theory of damages because the value
of 24/7's business before its demise cannot be proven with
reasonable certainty.

    As with lost profits damages, to recover damages for
destruction of its business, plaintiff must demonstrate that such
damages were caused by the breach, were fairly contemplated by
the parties, and are capable of proof and measurement with
reasonable certainty.  Dupont Flooring Sys. v. Discovery Zone,
Inc., No. 98-5101, 2004 U.S. Dist. LEXIS 13149, *15-16 (S.D.N.Y.
2004).  The fair market value of the business before its
destruction is the most common method of measuring destruction of
business damages.  Indu Craft v. Bank of Baroda, 47 F.3d 490, 496
(2d Cir. 1995) ("[W]hen the breach of contract results in the
complete destruction of a business enterprise and the business is

susceptible to valuation methods, such an approach provides the best method of calculating damages."). <u>See</u> <u>also</u> <u>S.A.B.</u>, 164 A.D.2d at 564; <u>Vandervelde v. Put & Call Brokers & Dealers Ass'n</u>, 344 F. Supp. 118, 150 (S.D.N.Y. 1972) ("When a plaintiff claims damages for total destruction of his business his recovery is bounded by the only value which his business had before it was closed which it did not have afterwards ... its going concern or good will value.") (internal quotation marks omitted) (ellipses in <u>Vandervelde</u>). Fair market value is usually determined by capitalization of expected future profits. <u>Consol. Rock Prods. Co. v. Du Bois</u>, 312 U.S. 510, 526 (1941). <u>See</u> <u>also</u> <u>Indu Craft</u>, 47 F.3d at 496; <u>Sharma v. Skaarup Ship Mgmt. Corp.</u>, 916 F.2d 820, 826 (2d Cir. 1990); <u>In re Seagroatt Floral Co.</u>, 78 N.Y.2d 439, 446 (1991).

24/7 has not proffered any admissible evidence as to the value of its business before the alleged breach of the agreement. <u>24/7 Records, Inc.</u>, 514 F. Supp. 2d at 575-77. Its failure to prove lost profits severely impairs its ability to provide a value for the alleged destruction of its start-up business. Revenue figures alone will not suffice to establish the value of its business. <u>S.A.B.</u>, 164 A.D.2d at 565. Accordingly, 24/7 cannot measure the value of its business with reasonable certainty.

### D. Loss of an Income-Producing Asset

In the joint pre-trial order, 24/7 asserts for the first time a theory of damages based on the loss of an income-producing asset. It argues that the distribution agreement was somehow an income-producing asset in which 24/7 invested over $1,000,000. This theory did not appear in 24/7's Rule 26(a) initial disclosures, nor did it appear in any supplemental disclosure. 24/7 made only the following disclosures regarding damages:

> 1. $1,826,250.00 – This element of damage results from the destruction and loss of 24/7's entire business as a result of the acts of defendants as alleged in the complaint. Documentation supporting this calculation is attached hereto as Exhibit "A" [(list of all contributions considered by 24/7 as investments in the LLC)].

> 2. Damages consisting of lost revenue from sales of "The Ketchup Song." The calculation of this element of damage is directly dependent upon information and documentation to be produced by defendants in the course of discovery.

     3. Damages for injury to and loss of good
     will in a sum to be assessed by the trier of
     fact.

     4. Damages for loss of profits as a result of
     breach of the Distribution Agreement in a sum
     to be assessed by the trier of fact.

     5. Punitive and exemplary damages in a sum to
     be determined by the trier of fact as claimed
     in the complaint.

    The loss of an income-producing asset theory has been
asserted just weeks before trial in the joint pre-trial order,
long after the close of discovery.  Rule 26(a)(1)(A)(iii)
requires initial disclosure of "a computation of each category of
damages claimed" and the evidentiary material upon which such
computations are based.  24/7 failed to make this mandatory
initial disclosure of the income-producing asset theory of
damages and its accompanying damages computation, thereby
depriving defendants of a meaningful opportunity to conduct
discovery as to this damages theory.
    According to Rule 37(c)(1):
        If a party fails to provide information ...
        as required by Rule 26(a) or (e), the party
        is not allowed to use that information ... to
        supply evidence on a motion, at a hearing, or
        at a trial, unless the failure was
        substantially justified or is harmless.

        In addition to or instead of this sanction,
        the court, on motion and after giving an
        opportunity to be heard:

           (A) may order payment of the reasonable
        expenses, including attorney's fees, caused
        by the failure;

           (B) may inform the jury of the party's
        failure; and

           (C) may impose other appropriate
        sanctions, including any of the orders listed
        in Rule 37(b)(2)(A)(i)-(vi).

Preclusion is "automatic" unless the non-disclosure was
substantially justified or harmless, or unless the district court
in its discretion chooses an alternative sanction as provided in
Rule 37(c)(1).  Design Strategy, Inc. v. Davis, 469 F.3d 284, 298
(2d Cir. 2006).  24/7's failure to disclose this theory of
damages was neither substantially justified nor harmless.

Accordingly, it is precluded from being presented at trial.  See id. (affirming exclusion of lost profits theory of damages that was first introduced in a proposed pre-trial order).

Moreover, the distribution agreement in question was not an income-producing asset; it was a contract for services.  Value is only produced under the agreement when music recordings are sold.  Coca-Cola Bottling Works v. Comm'r, 19 B.T.A. 267, 270 (1930) ("[P]etitioner could not operate without the contract, but this does not necessarily make of the contract an income-producing asset.  The same might be said of many sales or distribution contracts, ... but the contract itself does not usually produce income; it is the operations under the contract which give rise to income.")  24/7 could have distributed its product through other distribution mechanisms, but it either chose not to or was unable to secure other means of distribution.

E. Reliance Damages
Defendants move to preclude the reliance theory of damages because it was not included in 24/7's Rule 26(a) disclosures and because any damages would be offset by 24/7's operating losses.  In its opposition to summary judgment, 24/7 makes no attempt to argue that its non-disclosure of this damages theory and the related computations was either substantially justified or harmless.  Although the reliance theory was presented before the joint pre-trial order was submitted, it was not disclosed until a few months before trial, well after the close of discovery.  Given this non-disclosure, defendants were not able to ascertain whether and to what extent 24/7 may have relied on the agreement to its detriment before the alleged breach.  Consequently, because the omission was neither harmless nor substantially justified, the reliance theory of damages will be precluded under Rule 37(c)(1).  See Design Strategy, 469 F.3d at 298 (affirming exclusion of lost profits damages theory first disclosed in a proposed pre-trial order); Roberts v. Ground Handling, Inc., No. 04-4955, 2007 U.S. Dist. LEXIS 69992, *11-17 (S.D.N.Y. 2007) (preclusion of new theory that discrimination worsened the patient's medical condition that was disclosed three months before trial); Austrian Airlines Oesterreichische Lufverkehrs AG v. UT Fin. Corp., No. 04-3854, 2005 U.S. Dist. LEXIS 7283, *4 (S.D.N.Y. 2005) (preclusion of new currency conversion damages theory not disclosed until two weeks before the close of discovery).

Furthermore, 24/7 cannot prove reliance damages.  "[A] plaintiff may recover his expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract."  Bausch & Lomb, 977 F.2d at 729 (internal quotation marks omitted); see also Farash v. Sykes

Datatronics, Inc., 59 N.Y.2d 500, 504-05 (1983). "[A] reliance recovery will be offset by the amount of any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been fully performed." Bausch & Lomb, 977 F.2d at 729 (internal quotation marks omitted). Thus, in order to prove reliance damages, plaintiff must show foreseeable expenses legitimately made for performance of the agreement, minus any amount of loss that defendants show plaintiff would have sustained had the agreement been fully performed.

24/7 was formed two months before the distribution agreement was signed. The company was not created for the purpose of performing the agreement. Indeed, there was no requirement under the agreement that 24/7 put out any records whatsoever. The LLC obviously spent money on making records, but those expenditures were not made in reliance on the agreement, or for the purpose of performance of the agreement. 24/7 is unable to show with reasonable certainty that the total amount invested in the enterprise was made in reliance on the agreement on which it sues. See Interfilm, Inc. v. Advanced Exhibition Corp., 249 A.D.2d 242, 242-43 (1st Dep't 1998) (affirming preclusion of reliance damages theory for start-up film company that was forced to shut down when defendants refused to finance a third film because, inter alia, the total start-up costs sought as damages were "purely speculative" given failure of the first two films and absent evidence that the third would do better).

24/7 asserts that a $300,000 investment in the LLC by Putzi, the outside investor, in July of 2002 was made in reliance on statements by representatives of Artemis and RED. This allegation does not provide any support for the proposition that 24/7 or the LLC spent any money in reliance on the agreement. All it shows is that an additional investment by Putzi, who is not a plaintiff in this action, was made in the LLC after a meeting with Artemis and RED. Reliance damages concern money spent by the plaintiff in preparation for or partial performance of the agreement, not investments made by third parties. 24/7 also asserts that certain amounts were spent to promote specific artists and albums. The last payment for promotion noted by 24/7 was a payment of $25,000 on July 22, 2002, more than three months before the alleged breach. There is no evidence proffered by 24/7 to show that those services were not rendered.

Moreover, 24/7's reliance damages claim in the amount of $1,826,250 or $1,163,250 was not a foreseeable expense under the agreement. Those figures represent different measures of capital investments in the LLC. In any breach of contract action, regardless of the ultimate theory of damages, "[t]he party breaching the contract is liable for those risks foreseen or

which should have been foreseen at the time the contract was made." Ashland, 82 N.Y.2d at 403.  In addition, the LLC's tax returns and bank records show that the business was likely to continue losing money if it remained in operation.


## IV. Nominal Damages and Tortious Interference with Contract

Although 24/7 cannot prove that it is entitled to compensatory damages for breach of contract, it may prove that it is entitled to nominal damages. Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 95 (1993) ("Nominal damages are always available in breach of contract actions.").  However, "no cause of action for tortious inducement to breach a contract arises until actual damages are sustained; nominal damages associated with the underlying breach of contract will not stand in the stead of actual damages." Id. at 97. See also Int'l Flavors & Fragrances, Inc. v. Royal Ins. Co. of Am., 46 A.D.3d 224, 231 (1st Dep't 2007).  Because 24/7 cannot prove any compensatory damages for its breach of contract claim against Artemis, its claim against Sony for tortious interference with contract fails.

## V. Unfair Competition

Sony contends that nominal damages are unavailable for an unfair competition claim based on the Court of Appeals' reasoning in Kronos, 81 N.Y.2d at 95.  However, New York courts have granted nominal damages for unfair competition claims. See Brian E. Weiss, P.C. v. Miller, 166 A.D.2d 283, 284 (1st Dep't 1990); Avon Periodicals, Inc. v. Ziff-Davis Publ'g Co., 282 A.D. 200, 201 (1st Dep't 1953); Car-Freshner Corp. v. Big Lots Stores, Inc., 314 F. Supp. 2d 145, 154 (N.D.N.Y 2004); Meubelfabriek Van Pelt N.V. V. Neuman, No. 83-1927, 1984 U.S. Dist. LEXIS 18641, *7-8 (S.D.N.Y. 1984).  Moreover, an unfair competition claim under a misappropriation theory requires "acts or omissions by defendants that proximately caused a misappropriation [of] property or [a] benefit" of the plaintiff. Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 75 (2d Cir. 1988).  Thus, unlike tortious interference with contract for which compensatory damages must be proven, Kronos, 81 N.Y.2d at 97, compensatory damages are not an essential element of unfair competition, for which plaintiff must show the misappropriation of some property or benefit.

Sony argues that 24/7 cannot show that Sony misappropriated 24/7's labors or expenditures. Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 197 (2d Cir. 2001) ("The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures

....") (internal quotation marks omitted).  The Second Circuit
has already ruled that there is a genuine issue of material fact
as to whether Sony's actions that allegedly led to Artemis's
breach of the distribution agreement constituted unfair
competition.  429 F.3d at 47-48.  However, on an unfair
competition claim, plaintiff may recover the amount it would have
earned in the absence of a defendant's wrongful act, including
lost profits directly attributable to the wrongful act or profits
earned by the defendant that are derived from unfair competition.
Am. Safety Table Co. v. Schreiber, 415 F.2d 373, 381 (2d Cir.
1969); Suburban Graphics Supply Corp. v. Nagle, 5 A.D.3d 663, 666
(2d Dep't 2004); Hertz Corp. v. Avis, Inc., 106 A.D.2d 246, 251
(1st Dep't 1985).  As discussed above in § III. B., 24/7 cannot
prove lost profits directly attributable to Sony's alleged unfair
competition.  Nor did 24/7 include in its Rule 26(a) disclosures
any theory of damages based on the profits that Sony may have
derived from unfair competition.  Where, as here, plaintiff is
unable to prove damages for unfair competition without
speculation, it may seek nominal damages.  Am. Elecs., Inc. v.
Neptune Meter Co., 33 A.D.2d 157, 159-60 (1st Dep't 1969).

VI. Punitive Damages
        Defendants also move to preclude punitive damages.
"Punitive damages are not recoverable for an ordinary breach of
contract as their purpose is not to remedy private wrongs but to
vindicate public rights ....  However, where the breach of
contract also involves a fraud evincing a high degree of moral
turpitude and demonstrating such wanton dishonesty as to imply a
criminal indifference to civil obligations, punitive damages are
recoverable if the conduct was aimed at the public generally."
Rocanova v. Equitable Life Assur. Soc'y, 83 N.Y.2d 603, 613
(1994) (internal quotation marks omitted).  There is no
allegation or evidence that Artemis's conduct in allegedly
breaching the agreement was fraudulent or aimed at the general
public.  Accordingly, punitive damages for the breach of contract
claim are precluded.
        "Punitive damages are available in a tort action where the
wrongdoing is intentional or deliberate, has circumstances of
aggravation or outrage, has a fraudulent or evil motive, or is in
such conscious disregard of the rights of another that it is
deemed willful and wanton."  Swersky v. Dreyer & Traub, 219
A.D.2d 321, 328 (1st Dep't 1996).  Indeed, punitive damages are
available for an unfair competition claim "where a defendant's
conduct has constituted gross, wanton, or willful fraud or other
morally culpable conduct to an extreme degree."  Getty Petroleum
Corp. v. Island Transp. Corp., 878 F.2d 650, 657 (2d Cir. 1989)
(internal quotation marks omitted).

Although the standard for punitive damages is extremely high, there are factual disputes concerning Sony's conduct in relation to the agreement between Artemis and 24/7. "Whether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts ..., in this case the jury." <u>Nardelli v. Stamberg</u>, 44 N.Y.2d 500, 503 (1978) (citations omitted); <u>AT&T Info. Sys., Inc. v. McLean Bus. Servs., Inc.</u>, 175 A.D.2d 652, 653 (4th Dep't 1991) ("Whether plaintiff's conduct was so reprehensible as to warrant such damages ... is a question of fact to be determined at trial.") (citations omitted).

## VII. Miscellaneous Breach of Contract Claims

In addition to the primary breach of contract claim, 24/7 also asserted the following miscellaneous claims for breach of contract alleging that Artemis:

(a)  failed to pay royalties due to 24/7;

(b)  deliberately inflated the amount of returns by purchasers and wrongfully charged them against 24/7's account;

(c)  held excessive reserves purportedly needed to cover these returns;

(d)  refused to distribute and sell 24/7's product with diligence, care, and skill in breach of an implied covenant of good faith and fair dealing;

(e)  purported to incur expenses and charges for which 24/7 was not responsible under the agreement;

(f)  wrongfully retained an irrevocable letter of credit in the sum of $100,000 issued by 24/7;

(g)  improperly purported to charge 24/7 for promotional expenses; and

(h)  otherwise failed to act in accordance with Artemis' obligations.

Defendants move for summary judgment dismissing these miscellaneous claims, arguing that: no evidence has been proffered to support these claims; no notice and an opportunity to cure was provided as required by ¶ 14.03 of the distribution agreement; no calculation of the damages for these claims was provided as required by Rule 26(a); no written objection to Artemis's accounting statements was made as required by ¶ 7.04 of the agreement; and no claim regarding sales performance and returns is available as provided by ¶ 5.06 of the agreement.

Paragraph 7.04 of the distribution agreement provides in part as follows:

> All statements rendered by Distributor
> hereunder shall be conclusively binding upon
> you and not subject to objection by you
> unless specific objection in writing, stating
> the basis thereof, is given to Distributor
> within two (2) years from the date rendered.

Paragraph 5.06 provides as follows:

> Except as may otherwise be set forth to the
> contrary herein, you acknowledge that the
> sale and distribution of Records is
> speculative and you agree that, subject to
> the other provisions of this Agreement, the
> commercially reasonable judgment of
> Distributor with respect to matters affecting
> the sale and distribution of Records will be
> binding upon you. Distributor has not made,
> and does not hereby make, any representation
> or warranty with respect to the quantities of
> Records that may be sold or returned, or the
> proceeds that may be derived therefrom. You
> shall not make any claim, nor shall liability
> be imposed upon Distributor based upon any
> claim, that more sales could or should have
> been made than were made by Distributor, or
> that returns were excessive.

Additionally, ¶ 8.01 gives Artemis "the right to establish and maintain ... a reserve against returns ...."

These three paragraphs directly foreclose claims (a)-(e), (g), and (h). Any royalties or expenses that 24/7 argues were past due or were improperly charged should have been specifically objected to in writing pursuant to ¶ 7.04. Having failed to do so, 24/7 waived its right to sue for claims (a), (e), and (g). In ¶ 5.06, 24/7 relinquished its right to sue Artemis on the basis of excessive returns or ineffective sales. Therefore, claims (b), (c), and (d) must be dismissed. Artemis also had the contractual right to hold reserves to cover returns under ¶ 8.01, further mitigating claim (c). Claim (h) is dismissed for vagueness and because ¶ 5.06 precludes any such general claim regarding Artemis's performance of the agreement.

As for claim (f), the $100,000 letter of credit, neither 24/7 nor the LLC have standing to assert a claim for damages from Artemis's use of the letter of credit. The undisputed evidence demonstrates that Putzi and Susan F. Jones issued the letter of

credit and sustained any purported loss from its use.  Although
losses to the LLC and 24/7 have been treated as one and the same
here, see supra § III. A., principles of equity will not extend
so far as to treat potential losses to two individuals as losses
to 24/7 or the LLC.


CONCLUSION

        For the reasons discussed above, Artemis's motion for
summary judgment is granted dismissing the miscellaneous breach
of contract claims and the lost profits, destruction of business,
loss of an income-producing asset, reliance, and punitive damages
theories for the breach of contract claim.  Sony's motion for
summary judgment is granted dismissing the tortious interference
with contract claim, punitive damages for breach of contract, and
compensatory damages for unfair competition.  Summary judgment is
denied on all other grounds.


        SO ORDERED.


Dated:    New York, New York
          July 17, 2008


                  S/_____
                        MIRIAM GOLDMAN CEDARBAUM
                        United States District Judge